**PETER FOX BREWING COMPANY,**
**Plaintiff,**

v.

**SOHIO PETROLEUM COMPANY,**
**Defendant.**

**No. 54 C 566.**

United States District Court
N. D. Illinois, E. D.
April 25, 1958.

Memorandum and Order Nov. 5, 1958.

Findings of Fact, Conclusions of Law and Decree Dec. 16, 1960.

Antonow & Weissbourd and Robert Friedlander, Chicago, Ill., for plaintiffs.

Ross, McGowan & O'Keefe, Chicago, Ill., McAfre, Grossman, Taplin, Hanning,

Newcomer & Hazlett, Cleveland, Ohio, for defendants.

CAMPBELL, Chief Judge.

It is clear from the complaint, from the copious briefs filed by both parties, and from the argument of counsel, that the legal issues presented by this case are of considerable complexity.

In Count I of their complaint in equity, plaintiffs pray that the agreement of August 20, 1943, be modified and altered, as of October 1, 1947, to eliminate the fixed per-well deduction as to all wells whether operating or not. They also pray for such other relief as in equity shall deem meet.

In Count II, at law, plaintiffs pray that judgment be entered in their favor in the amount of $28,520, representing fixed per-well deductions retained by defendants in respect of wells which had been plugged.

The parties have filed a stipulation of fact, with the declared intention of submitting certain issues of law for determination at this stage.

I have read the stipulation and I have read the briefs, and I confess that I am at a loss to see just what issues of law have been submitted for my determination at this stage.

Plaintiff, Tek Oil Corporation, states those issues to be:

(a) That the compulsory unitization of the assigned properties pursuant to the Oklahoma Statute has, by operation of law, modified the agreements between the parties to the extent necessary to make them compatible with the conditions of unitized operation;

(b) That the provision for monthly per-well deductions contained in the Agreements is incompatible with unitized operation and, therefore, became inapplicable upon the creation of the Unit; and

(c) That the plaintiffs are, therefore entitled to the recovery of the amounts of all the monthly per-well deductions made by the defendant

since the effective date of unitization, and to the reformation of the Agreements in accordance with the intent of the Oklahoma statute.

Plaintiffs Schmitz, Northern Trust Company, and Dangler state:

"The main question to be determined is whether or not Section 4(b) of the Agreement of August 20, 1943, and a similar provision in the Agreement of February 15, 1944, providing for deduction from the overriding royalty interest has been superseded by the creation and the operation of the West Edmond Hunton Lime unit * * *."

The defendants, on the other hand, say that:

"the parties hereto have filed a stipulation of facts so that the Court may make a determination of the preliminary question whether the plan of unitization signed by the plaintiffs or their predecessors precludes them from maintaining this action."

Whether defendants' statement of the issue presented at this stage is accurate or not, (and I should say here that in view of the length and complexity of the arguments presented in the brief I would be inclined to doubt this), the fact remains that, on the stipulation of facts filed in this case, that issue and that issue alone can be determined at this time. There is not enough before me in your stipulation to determine any of the other things referred to.

The stipulation of fact barely recites the salient features of the agreements of August 20, 1943, and February 15, 1944; it states the history which brings the various parties into the case; it states that a plan of unitization involving plaintiff's leasehold interest became effective October 1, 1947; and finally, the stipulation states that since October 1, 1947, Sohio Petroleum Company has computed payments accruing to the overriding royalty interest now owned by the plaintiffs on the basis of the quantities of oil and gas allocated, in accordance with the plan,

to the tracts of land that are subject to said overriding royalty interest, by deducting $200 per month for each quarter-quarter section or tract of approximately forty acres and that the computation was continued as to those tracts on which wells have been abandoned.

On the basis of this stipulation and on a reading of the Oklahoma statute and of the plan adopted thereunder, I am prepared to hold:

That there is nothing in the statute or the plan which requires that a fixed per-well deduction be transmuted in a fixed per-tract deduction. The first paragraph of Section 287.9 of the statute (Title 52, Oklahoma Statutes, 1951), provides:

"Property rights, leases, contracts, and all other rights and obligations shall be regarded as amended and modified to the extent necessary to conform to the provisions and requirements of this Act and to any valid and applicable plan of unitization or order of the Commission made and adopted pursuant hereto, but otherwise to remain in full force and effect."

Defendants argue that this provision requires that a fixed per-well deduction be transmuted into a fixed per-tract deduction when read with the following paragraphs of Section 287.9.

Paragraph 4:

"Operations carried on under and in accordance with the plan of unitization shall be regarded and considered as a fulfillment of and compliance with all of the provisions, covenants, and conditions, express or implied, of the several oil and gas mining leases upon lands included with the unit area, or other contracts pertaining to the development thereof, insofar as said leases or other contracts may relate to the common source of supply or portion thereof included in the unit area. Wells drilled or operated on any part of the unit area no matter where located shall for all purposes be regarded as wells drilled on each sepa-

rately-owned tract within such unit area."

■ This provision is clearly intended to relieve the person whose duty it is to drill wells from forfeiture for failure to perform a pre-unitization obligation to drill. To interpretet this provision as requiring that a pre-unitization fixed per-well deduction be transmuted into a per-tract deduction is in my opinion absurd.

With reference to the last portion of this provision, defendants say:

"Realizing the importance of wells in applying the provisions of leases and other contracts (such as the agreement under which plaintiffs' claim) the Legislature further provided that so long as wells are being drilled or operated anywhere within the unit area, each tract within the unit area shall be deemed conclusively to have a well located thereon."

There is no reference to a "well" in this provision. The provision says:

"Wells driven or operated on any part of the unit area * * * shall be regarded as wells drilled on each separately-owned tract."

It seems to me that the Legislature of Oklahoma at least intended that each tract should be *deemed* to have as many wells drilled thereon as is necessary to discharge the obligations of the lessee. The obligations of the lessee might be to drill two or more wells in each tract.

Obviously, to protect him effectively, this provision must envisage that as many wells will be *deemed* to have been drilled on the tract as it is his obligation to drill. In fact, the wording of the provision is that all the wells drilled elsewhere in the unit will be deemed to have been drilled on the tract. Once it is admitted that, under this provision, more than one well might be deemed to have been drilled on a tract, it is impossible to say that it lends support to defendants' contentions for it would then equally support the contention that one empty tract is subject to as many fixed per-well deductions as it might have been defend-ants' duty to drill on the tract or, (on a literal reading of the provision), as many fixed per-well deductions as there are wells in the unit.

Moreover, the provision speaks of wells deemed to have been "drilled," not of "producing wells." The fixed per-well deduction here involved is due on "each producing well," and not on "each well which is drilled."

Paragraph 3:

"The amount of the unit production allocated to each separately-owned tract within the unit, and only that amount, regardless of the well or wells in the unit area from which it may be produced, and regardless of whether it be more or less than the amount of the production from the well or wells, if any, on any such separately-owned tract, shall for all intents, uses and purposes be regarded and considered as production from such separately-owned tract, and, except as may be otherwise authorized in this Act, or in the plan of unitization approved by the Commission, shall be distributed among or the proceeds thereof paid to the several persons entitled to share in the production from such separately-owned tract in the same manner, in the same proportions, and upon the same conditions that they would have participated and shared in the production of proceeds thereof from such separately-owned tract had not said unit been organized, and with the same legal force and effect."

I do not see how this provision requires that a fixed per-well deduction be transmuted into a fixed per-tract deduction, since a fixed per-well deduction cannot be described as the "same condition" as a fixed per-tract deduction. Whether the two are in fact the same is one of the questions that will have to be determined in this case on proper proof. Certainly the stipulation is insufficient for this purpose. *Prima facie* a fixed per-well deduction is not the same thing as a fixed per-tract deduction.

It is conceded by all parties that the plan follows the statute insofar as it has a bearing on the question I am discussing.

Accordingly, I hold that there is nothing in the Statute or the plan which requires that a fixed per-well deduction be transmuted into a fixed per-tract deduction. This being so, the plaintiffs are obviously entitled to proceed with their case.

Plaintiffs suggest that I should order an accounting to secure the information missing in the stipulation. I must first determine that an accounting is due, and I must determine from whom it is due and to whom it is due. I cannot order an accounting merely because I find it difficult to tell who is right in this controversy, on the limited stipulation that you have filed here. The plaintiffs must show that they are entitled to relief, and in this they have the aid of this Court's discovery procedures. Moreover, defendants state in their brief that they intend to assert the defense of laches and to rely upon an agreement of compromise as to which the stipulation is silent.

Accordingly, I am unable to go further at this time than to say that plaintiffs may proceed with their case. I might add that I am disappointed that the lengthy pre-trial conferences and the many conferences which I know you counsel have been holding back and forth in your various offices, have produced so small a result in the stipulation.

### Memorandum and Order

Plaintiffs are the owners of specific "overriding royalty" interests in certain oil and gas leases covering lands in what is known as the "West Edmond" oil field in the State of Oklahoma. These interests were created by two agreements made by plaintiffs and their predecessors in interest with the Standard Oil Company (Ohio). In 1944, Standard Oil Company transferred its interest to the defendant Sohio Petroleum Company. In December, 1954, the Christiana Oil Corporation acquired the interest of the Peter Fox Brewing Company, while on November 8, 1956, the Tekoil Corporation became a party plaintiff by reason of its purchase of the Christiana interest.

The relief sought by plaintiffs is based on alleged changes in and modifications of their rights in respect to their overriding royalty interests through the creation of the West Edmond Hunton Lime Unit. This unit was created by order of the Corporation Commission (An administrative agency of the State of Oklahoma) dated July 29, 1947. In creating the unit, the Commission prescribed a "plan of unitization." The unit and plan were pursuant to a "Unitization Statute" enacted in 1945 and re-enacted in 1951.

The original agreement entered into between the parties reserved an overriding royalty, free of cost, one half of seven-eights of the oil and gas produced from the lands covered by the agreement, after deducting from such one-half that quantity of oil and gas equal in value to $200 per month for each producing well, except that in the case of a well producing water amounting to more than 10% of the total fluid produced, the deduction was to be $250 per month. However, since October 1, 1947, when unitization became effective, the deduction has been limited to $200 per month to each tract. Since January 1, 1951, six wells have been plugged but the defendants have still charged $200 per tract although the well thereon was plugged.

In Count I of their complaint in equity, plaintiffs pray that the agreement of August 20, 1943, be modified and altered, as of October 1, 1947, to eliminate the fixed per-well deduction as to all wells whether operating or not. They also pray for such other relief as in equity shall deem meet. In Count II, plaintiffs pray that judgment be entered in their favor in the amount of $28,520. representing fixed per-well deductions retained by defendants in respect of wells which had been plugged.

On April 25, 1958, on a motion by defendants, after considering a Stipulation of Facts and voluminous briefs filed by the parties, I ruled that there is nothing in the Statute or the Plan which *requires*

that a fixed per-well deduction be transmuted into a fixed per-tract deduction and that therefore, plaintiffs were entitled to proceed with their case.

On June 20, 1958, plaintiff moved for an order to require defendants to produce certain documents. Defendants on June 30, 1958, interposed through a motion to dismiss an additional defense raising the issue of whether plaintiffs had exhausted their alleged administrative remedies.

The plaintiffs' motion for discovery and defendants' motion to dismiss raise the following issues:

1. Should the complaint be dismissed because plaintiffs allegedly "have not pursued the administrative remedies afforded them by the State of Oklahoma?"

2. Have defendants waived their right to object to plaintiffs alleged failure to exhaust their administrative remedies?

3. Is plaintiff entitled to the discovery of the documents designated in its motion?

The defendants state that "the precise question presented by this motion to dismiss" is that the "plaintiffs have not exhausted their administrative remedies." (Defendant's brief, p. 8) The defendants also refer to the doctrine of "primary jurisdiction" (Defendants' brief, pp. 18, 19). The interchange of these different concepts in support of the motion to dismiss presents some difficulty in the understanding of the issues presented.

The doctrine that administrative remedies must be exhausted before resort is had to Federal courts is as old as Federal administrative law and is said to rest on the disinclination of the judiciary to interfere with the exercise of legislative power. See 48 Yale L.Rev. 981, 983. The development of the doctrine has been shaped by various factors:

1. The need for orderly procedure. United States v. Sing Tuck, 194 U.S. 161, 168, 24 S.Ct. 621, 48 L.Ed. 917;

2. The requirements of comity. Railroad and Warehouse Commission of Minnesota v. Duluth St. Railway, 273 U.S. 625, 628, 47 S.Ct. 489, 71 L.Ed. 807;

3. The tendency to assimilate the doctrine to the rule that a litigant has no standing in equity where he has an adequate remedy at law. Elliott v. El Paso Electric Co., 5 Cir., 88 F.2d 505, 506. The exhaustion rule also applies to suits at law. Anniston Mfg. Co. v. Davis, 301 U.S. 337, 343, 57 S.Ct. 816, 81 L.Ed. 1143;

4. Premature judicial intervention may defeat the basic legislative intent that full use be made of the agency's specialized understanding within the particular field. Davis, Administrative Law, Sec. 184.

In contrast to the "exhaustion" doctrine, which is a product of judicial self-limitation and amounts to a refusal to exercise jurisdiction upon grounds resembling the requirements of equity jurisdiction, the rule of exclusive preliminary administrative jurisdiction or "primary jurisdiction" presupposes a complete absence of judicial power because of legislative grant of exclusive jurisdiction to an administrative body. Texas and Pacific Railway Co. v. Abilene Cotton Oil Company, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553.

Thus under the "primary jurisdiction" doctrine, the administrative commission has exclusive jurisdiction over the subject matter by virtue of legislative enactment and the courts have no jurisdiction primarily. Under the "exhaustion" doctrine, the courts do have jurisdiction primarily, but refuse to exercise it for the reasons discussed above until all possible administrative determination has been completed.

To apply the "exhaustion" doctrine here an administrative remedy must be shown to exist which would allow the Corporation Commission of Oklahoma to construe written agreements between parties, decree equitable reformation of these agreements, decree an accounting and enter a money judgment if that be the case. The Corporation Commission

cannot exercise these functions unless power to do so is vested in it by the Constitution and Statutes of Oklahoma. Application of Central Airlines, 199 Okl. 300, 185 P.2d 919, 921. The defendants maintain that the Commission has "all the powers and attributes of a Court of Record." I find however that Article 9, Sec. 19 of the Oklahoma Constitution cited by defendants, on its face grants to the Commission certain restricted quasi-judicial powers in regard to the regulation of corporations but grants no power to adjudicate private controversies. Southwestern Light & Power Co. v. Elk City, 1940, 188 Okl. 540, 111 P.2d 820.

■ The defendants also cite Sec. 286.11 of the Oklahoma Laws of 1945 which provides in part that after creating a unit the Commission "shall retain jurisdiction * * * for the purpose of amending the plan of unitization * * *" Obviously, this is not a grant of authority to retain jurisdiction for any purposes which the Commission may specify. Jurisdiction is retained only to amend the unitization plan. It is elementary that an administrative tribunal cannot lift itself by its own bootstraps into an authority not conferred upon it by legislation. See Okla.L.Rev. 389, 403. The plaintiffs do not seek or require an amendment of the plan of unitization which renders this section not pertinent. Further, to consider the pursuit of such an amendment as an administrative remedy would be impractical since the consent of the lessees of record and the royalty owners of record of not less than 63% of the unit area would be required under this statute.

Defendants next cite Sec. 112 of 52 Okla.Stat. (1951) which provides in part:

"Any person affected by any Legislative or administrative order of the Commission shall have the right at any time to apply to the Commission to repeal, amend, modify, or supplement the same."

Since plaintiffs have no quarrel with any order of the Commission, this section is not relevant. In short, I find no relevant provision of law which provides plaintiffs with an administrative remedy which they must exhaust before having recourse to the courts.

Defendants rely heavily on Constantin v. Martin, 10 Cir., 1954, 216 F.2d 312 to support their contention that plaintiffs had not exhausted their administrative remedies. In this much criticized (See 8 Okla.L.Rev. 389) case, there were involved two conflicting and ambiguous provisions in the Plan. Therefore, the court felt that the Plan required "possible clarification by the Commission, under its retained jurisdiction." Id. at page 317. In the case at bar, the Plan is neither ambiguous nor in issue. Therefore, the Constantin case is not analogous.

Assuming, however, that the problem here is not one of "exhaustion of remedies" but of "primary" jurisdiction, I have found no provision which purports to grant exclusive jurisdiction to the Commission in cases such as the one at bar. Furthermore, it is well known that Oklahoma has in the past zealously guarded the jurisdiction of the courts over private disputes which may arise under an administrative commission but which in no way affect the public interest. Smith v. Corporation Commission, 101 Okl. 254, 225 P. 708. Also see 51 Harv.L.Rev. 1258, 1259; 8 Okla.L.Rev. 404–407. It seems well settled in Oklahoma that there would have to be a "clear showing of adverse effect on conservation objectives to justify interference (by the Commission) with prior contracts" Okla.L.Rev. 389, 406.

Defendants vaguely attempt to show such an adverse effect by maintaining that this case requires the Court to interpret and construe the Plan of Unitization and that any decree entered by this Court would in effect "repeal, amend, modify and supplement" the Order entered by the Corporation Commission. I cannot see how any decree entered by this court in this case would result in a "clear showing of adverse effect on conservation objectives." On the contrary, in a private suit of this nature, the objectives of conservation will not be affected at all.

Cabot Carbon Co. v. Phillips Petroleum Co., Okl.1955, 287 P.2d 675.

■ I am of the opinion that plaintiffs have no administrative remedies to exhaust and that the question of "primary" jurisdiction of the Commission is not presented in a private suit of this nature. This is substantiated by Texola Drilling Co. v. Oklahoma Corporation Commission, Okl.1955, 281 P.2d 405 and Young v. West Edmond Hunton Lime Unit, Okl., 275 P.2d 304.

Furthermore, this case has been pending several years during which time both court and counsel have devoted countless hours to preparation, discovery, stipulations, hearings, briefs and pre-trial conferences in attempting to bring this case to trial. Therefore, even if there were administrative remedies that should have been exhausted by the plaintiff, I would be tempted to hold that defendants had waived the right to urge such a defense at this late date.

The defendants' motion to dismiss is hereby denied.

As to plaintiffs' motion and supplemental motion for discovery, it had been my hope that as a result of our many conferences and hearings the parties would agree on these matters to facilitate the determination of this case and that difficulties such as presented by this contested motion would not arise to further delay the trial. It now seems that the parties cannot agree at all and are contesting almost everything. I cannot now say from what I know so far of this case, that the plaintiffs are not entitled to the documents they ask so I hereby order their production for inspection and copy during regular office hours on business days at the offices of the defendant where the documents are kept. However, since it is impossible for me to say at this time whether or not the production and copy of these documents or some of them would be unnecessary to plaintiffs' case and thus a hardship on defendants, I shall reserve my ruling on defendants' motion to tax costs of discovery against the plaintiff for further argument and determination after the trial is concluded.

So ordered.

### Findings of Fact, Conclusions of Law and Decree

Plaintiffs, the owners of specific "overriding royalty" interests in certain gas and oil leases covering lands in what is known as the "West Edmond" oil field in Oklahoma, bring this action in equity for reformation of agreements and accounting and in law for money judgment against defendants under agreements of August 20, 1943 and February 15, 1944, whereby plaintiffs assigned the leases to defendants reserving overriding royalty interests. Jurisdiction is based upon diversity of citizenship, Title 28 U.S.C. § 1332. The cause is presently before me for disposition after trial and upon a stipulation of facts, together with the exhibits and briefs of the parties.

Early in 1943, plaintiffs William J. Fox and Frank G. Fox (hereinafter jointly and severally referred to as "Fox") and Herbert J. Schmitz (hereinafter referred to as "Schmitz") by virtue of an investment of $24,000 in the discovery well in the West Edmond Hunton Field in Oklahoma acquired 2400 acres of oil and gas leases. In June or July of 1943 Fox and Schmitz engaged in negotiations with defendant, Standard Oil of Ohio (hereinafter referred to as "Standard") wherein after several drafts (plaintiffs' exhibits 3, 6; transcript p. 16), a final agreement was signed on August 20, 1943 (plaintiffs' exhibit 1) assigning some of plaintiffs' leases to Standard and reserving an overriding royalty interest. This agreement provides in part as follows:

"(4) The assignments to be executed and delivered by Fox to Standard or its nominee hereunder shall expressly reserve to Fox, and Fox does hereby expressly reserve an overriding royalty (free and clear of all development and operating expense), with respect to all of the leases listed and described in Exhibit 'A': hereof as a group, of one-half

of the crude oil, gas, casinghead gas, and other hydro-carbons produced, saved, and marketed from said leasehold premises or the proceeds thereof accruing to the working interests assigned and transferred hereunder to Standard or its nominee, subject, however, to a deduction from said one-half (½) of the following items:

"(a) That quantity of said crude oil, gas, casinghead gas, and other hydro-carbons, or the proceeds thereof, which at current well market prices at the time of sale thereof shall be equal in value to one-half of all amounts required to be paid by Standard or its nominee to Kerlyn Oil Company or its assigns on account of the reservation of oil payments by said Kerlyn Oil Company in a certain Agreement dated April 21, 1943, between Herbert J. Schmitz, W. J. Fox and F. G. Fox, and Kerlyn Oil Company, which said oil payments so far as concerns the transaction herein set forth pertain to lands known as E–½, NW–¼; Section 5, Township 13N, Range 4W, SE–¼, NW–¼, Section 5, Township 13N, Range 4W, and the North 106 acres of NE–¼, Section 4, Township 13N, Range 4W.

"(b) That quantity of crude oil, gas, casinghead gas, and other hydro-carbons, or the proceeds thereof, which, at current well market prices at the time of sale thereof, shall be equal in value to $200.00 per each producing well per month except that in the event that any well producing oil in paying quantities shall at the same time produce water in excess of 10% of the total fluid produced from the well, then as to that well during any such period while such condition shall exist the deduction shall be that quantity of crude oil, gas, casinghead gas, and other hydro-carbons, or the proceeds thereof which at current well market prices at the time of sale thereof shall be equal in value to $250.00 per month."

On February 15, 1944, Fox assigned some additional leases to Standard by an agreement (plaintiffs' exhibit 2) which, insofar as it relates to the present controversy is identical with the agreement of August 20, 1943. (Hereinafter both instruments referred to as "the agreements").

By way of assignment, three of the present plaintiffs, Christiana Oil Corporation, Tekoil Corporation and Schmitz Oil Company, acquired their interests in the overriding royalties during the pendency of this suit. Of the four original plaintiffs, Peter Fox Brewing Company, the Northern Trust Company, Herbert J. Schmitz and David Waller Dangler, only Herbert J. Schmitz remains a party and his interest is limited to 35% of the overriding royalty in six of the twenty-three unit tracts involved. In 1945, defendant Standard assigned to its wholly-owned subsidiary, defendant Sohio Petroleum Company (hereinafter referred to as "Sohio"), its entire interest in the leases covered by the agreements.

The Hunton Lime formation in the West Edmond field was developed under spacing orders issued by the Oklahoma Corporation Commission (hereinafter referred to as the "Commission") in 1943 and 1944 (stipulation, S–2). These orders made each quarter-quarter section of approximately forty acres a "drilling" or "spacing" unit and prohibited the drilling of more than one Hunton Lime well on any such spacing unit. In 1945, Oklahoma enacted a Unitization Act (hereinafter referred to as the "Act") which empowered the Commission to consolidate diversely owned and operated oil and gas leases under a single unit without the consent of all parties in interest. 52 Okla.Stat., Section 287.1 et seq. (1951). On July 29, 1947, the Commission, pursuant to this statute, issued an order unitizing the entire Hunton Lime formation (stipulation S–1), including the twenty-three tracts covered by the agreements involved in this action (stipulation pars. 4 and 5), and prescribing the "Plan" (plaintiffs' exhibit 21) to govern the development and operation of the unit

area and the distribution of the unit production—i. e., all oil, gas and other hydrocarbons produced from the area. Article IV of the Plan, referring to the spacing order of 1944 (stipulation S–2), renders each quarter-quarter section within the unit area a "separately owned tract". Each such tract is identified, numbered and given a "percentage interest" in exhibit B to the Plan.

Article VII of the Plan requires that all unit production, except that used in operations or unavoidably lost, shall be apportioned among and allocated to the separately owned tracts in accordance with their percentage interests as shown in exhibit B to the Plan. Since October 1, 1947, when unitization became effective, the overriding royalties here involved have been computed in the quantities of unit production allocated to the twenty-three tracts subject thereto after deducting production as provided in paragraph 4(b) of the agreements, as modified by subsequent action of the parties (stipulation—par. 7), equal in value to $200 per well per month. Although the wells on some of the twenty-three tracts were abandoned from time to time at the direction of the operating committee of the unit pursuant to Article XXIV of the plan, the deduction was continued in the same manner as if a producing well was located on each tract.

In essence, the agreements involved in this action reserved as an overriding royalty, a portion of the production obtained under the leases thereby, after deducting from such portion production equivalent in value to "$200.00 per each producing well per month". The only question presented by the pleadings and the evidence is whether or not unitization as aforesaid requires elimination of, or reduction in, the amount of this monthly per well deduction.

It is plaintiffs' position that:

1. The Oklahoma Unitization Act and basic principles of equity require that the agreements be reformed to make them compatible with unitized operations;

2. The agreements must be reformed as of the effective date of unitization by eliminating the provision in the agreements (par. 4(b)) for fixed monthly per well deductions and by substituting for it a provision for the deduction from plaintiffs' interest of one-half of the monthly unit operating expenses allocated to the tracts in controversy;

It is defendants' position that:

1. The applicable provisions of the Plan prohibit any change in the method of computing the overriding royalties;

2. Unitization requires the assumption that a producing well is located on every quarter-quarter section of land within the unit area, whether or not a well is actually located thereon;

3. Plaintiffs are barred from this action by laches and the statute of limitations;

4. Plaintiffs have compromised or waived their right to relief by virtue of the agreement entered into between the parties on October, 1947.

During the unavoidably long pendency of this suit, I have had occasion to exhaustively study the Oklahoma Act, the Plan and agreements in question, as well as many of the facts and much of the law herein set forth in the stipulation together with exhibits and briefs of the parties. For example, on April 25, 1958, on a motion by defendants, after consideration of a prior stipulation of facts, the exhibits and briefs of the parties, I held, by way of memorandum, that there is nothing in the Act or Plan which *requires* that a fixed per well deduction be transmitted into a fixed per-tract deduction and that plaintiffs were entitled to proceed with their case. On November 5, 1958, after again considering the Act and Plan as well as further briefs of the parties, I denied in a memorandum defendants' motion to dismiss because of the failure of plaintiffs to exhaust their administrative remedies.

Defendants in their first argument contend that the Plan prohibits any change in the method of computing overriding royalties. In support of this argument, they cite Article VII of the Plan which provides that:

" * * * the Unit Production allocated to each Separately Owned Tract shall be distributed among or the proceeds thereof paid to the several persons entitled to share in the production from such Separately Owned Tract in the same manner, *in the same proportions,* and upon the same conditions that they would have participated and shared in the production from such Separately Owned Tract, or the proceeds thereof, had not the Unit been organized, and with the same legal force and effect."

Defendants argue that if the per well deduction is eliminated or reduced, defendants will not share in the unit production allocated to the twenty-three tracts "in the same proportions" as they would have shared in actual production from those tracts in the absence of unitization since defendants would not receive the first $400.00 worth of oil and gas produced from each tract during each month and, consequently, the balance of royalties to be shared equally with plaintiffs would result in a decreased share for defendants. Defendants argue that this change in proportionate shares is expressly prohibited by the Plan. I do not agree. Plaintiffs, arguing from the Act, quote the provision upon which Article VII of the Plan is based and contend that this provision entitles them, according to the theory of their action, to reformation of the agreements. It seems clear, as I broadly indicated in my memorandum of November 5, 1958, and I so hold now, that Article VII of the Plan does not prohibit reformation of the agreements if plaintiffs should here prevail.

The second argument advanced by defendants is one that I considered in my memorandum of April 25, 1958, namely, that the Plan requires the assumption that a producing well is located on each quarter-quarter section and that therefore, the per well deduction is valid and justified. Though I am familiar with the principle of assumption as it relates to the unit production of the West Edmond Field, I am not prepared to find now, nor did I find on April 25, 1958, that this principle of assumption extends to the per well deduction which is the subject matter of this action. On the contrary, I find now, as I found then, that the principle of assumption as it relates to unit production, does not, by virtue of the Act or Plan, transmit a fixed per well deduction into a fixed per-tract deduction.

As to defendants' third argument, I find that plaintiffs are not barred from this action by laches or the statute of limitations.

Although I believe it pertinent to the issues before me that this action was commenced in April, 1954 more than ten years after the agreements had been executed and put into effect and six and one-half years from the time unitization became effective, I find that the evidence does not support the defense of laches or of the statute of limitations. However, as I indicated in my memorandum of November 5, 1958, I am not inclined to allow amendments urging technical defenses on the eve of trial after many years of discovery and preparation for trial. Accordingly, defendants' motion of November 18, 1959 to amend defendants' answer to include the defense of the statute of limitations is denied.

Thus disposing of these matters, I shall now consider plaintiffs' first argument.

I find that the Oklahoma Unitization Act and basic principles of equity do not require that the agreements be reformed to make them compatible with unitized operation.

Plaintiffs in this regard argue in their brief at page 12 that the agreements, by their express terms, are "conditioned upon the competitive exploitation by defendant of the assigned leases by means of the most speedy and intensive operation possible"; that "all wells be operated at maximum production; that no producing

well be shut down except for the shortest time necessary for required repairs and reconditioning; that offset wells be drilled and that the properties be developed in compliance with the 'prudent operator' rule."

Paragraph 5 of the agreements in fact provides:

"Except for the purpose of making necessary repairs to equipment or the performing of any reconditioning work on any well, standard agrees that no producing well shall, during any period so long as the same is producing oil and/or gas in paying quantities, be shut in unless pursuant to an order, rule or regulation of any officer, board, or agency, state or federal. Standard further agrees that all producing wells hereafter drilled on the aforesaid proportion will be operated at all times in such manner as to produce at the maximum rate of production allowed from time to time by the state or federal authority having jurisdiction."

It is difficult for me to understand why, in view of the express provision above with regard to possible government regulation of wells resulting in "shut in" wells, that the agreements should be silent in this event as to the per well deductions provided in paragraph 4(b) of the agreements.

Paragraph 8 of the agreements, insofar as pertinent, provides:

" * * * Standard agrees to manage and develop the entire of the premises covered by such leases or to cause the same to be managed and developed to the mutual interest of both parties and in compliance at all times with the 'prudent operator' rule as well as with due regard to the mutual interests of both parties."

Based upon these provisions plaintiffs argue that "compulsory unitization of the assigned tracts under the Act made competitive exploitation illegal and rendered the agreements impossible of performance;" that "(u)nder the common law, the agreements would thereupon have been subject to rescission."

I find that the agreements do not contemplate "competitive exploitation" in the sense that plaintiff here argues since paragraph 5 expressly refers to possible government regulations. It follows that subsequent unitization could not render "competitive exploitation" illegal and the agreements impossible of performance since this action is expressly contemplated in the agreements and is incorporated into the provisions for well production. It follows that the agreements are not subject to rescission at common law. Furthermore, the effect of unitization upon plaintiffs' overriding royalty interests does not render the agreements impossible of performance since, instead of reserving a portion of the oil and gas produced from the twenty-three tracts, unitization has made the overriding royalties payable out of oil and gas allocated to the twenty-three tracts so as to actually benefit plaintiffs.

The principal contention of plaintiffs is that, based upon certain provisions of the Act, certain Oklahoma statutes and decisions governing the interpretation of contracts, the agreements should be reformed in accordance with the original intention of the parties.

Schmitz and Fox testified that it was the intention of the parties that they receive one-half of production and bear one-half of operating expenses. They further testified that the monthly per well deduction provided for in the agreements was intended to represent one-half of actual operating expenses (transcript, pp. 12, 19, 21, 39, 43, 44, 46).

The background of these agreements is as follows: The discovery well in which Schmitz and Fox participated was completed April 12, 1943 (stipulation S-1, par. 3). In June, 1943 they began their discussions relating to the assignment of the leases here in question with Standard. An agreement was drawn up and signed in Chicago on July 2, 1943 (plaintiffs exhibits 4 and 5). No copy of this agreement has been retained by any of the parties. It is said to have reserved to

Schmitz and Fox a "net profits interest" which according to their tax counsel, would not have been entitled to depletion allowance for income tax purposes. (transcript, pp. 12, 13, 41). They therefore contacted Standard who agreed to write a second agreement which they felt would entitle them to depletion consideration with the result that a final agreement was executed on August 20, 1943. Plaintiffs' exhibit. 3 represents the earliest agreement draft. It sets forth a formal offer, detailed terms for assignment of the leases therein and provides for acceptance by Standard. It is dated June 25, 1943 and appears on the stationery of Howard B. Hopps, an Oklahoma City lawyer, who was present at the Chicago meeting which resulted in the agreement of July 2, 1943. Plaintiffs' exhibit 6 is a proposed agreement prepared by Standard and submitted to Schmitz and Fox by letter dated August 3, 1943 (plaintiffs' exhibit 5).

The following comparisons can be made of these several drafts:

1. The Hopps draft of June 25, 1943 reserves to Schmitz and Fox one-half of "net operating profits" as determined by deducting from production proceeds "operating costs" plus $50.00 per month for each producing well (par. 4). Schmitz and Fox assumed personal obligation to pay one-half the cost of the third, fourth and sixth dry holes and in addition, promised to pay one-half of the cost of additional dry holes drilled commencing with number 8 (par. 3).

2. The draft prepared by Standard and forwarded to Schmitz and Fox on August 3, 1943 reserves "overriding royalty" of one-half the proceeds of working interest production less (a) $150.00 per well per month or $187.50 per well per month in the case of a well making more than 10% water and (b) one-half the actual cost of acidizing, deepening, plugging back, shooting, or reconditioning the wells (par. 6). Schmitz and Fox assumed personal obligation to pay one-half the cost of the third, fourth and sixth dry holes (par. 5).

3. The final agreement of August 20, 1943 reserved overriding royalty "free and clear of all development and operating expenses" of one-half of working interest production less $200.00 per month per producing well, or $250.00 per month in case of a well making more than 10% water.

Based upon these comparisons defendants argue in their brief at pages 20 and 21 as follows:

"The expression 'free and clear of all development and operating expenses' appeared in the final agreement for the first time. The first draft, the third draft and probably the second draft, imposed on Schmitz and the Foxes personal obligation to bear one-half of the cost of the third, fourth and sixth dry holes that might be drilled by Sohio. The first draft provided for deduction of $50.00 per well per month in addition to operating expenses. The third draft provided for deduction of $150.00 (or $187.50) per well per month plus one-half the costs incurred by Sohio in acidizing, deepening, plugging back, etc.

"The prior drafts show beyond question that the monthly deduction of $200.00 or $250.00 per well provided for in the final agreement was not intended to represent one-half of actual operating expenses. It included allowance for the extra $50.00 per well per month provided for in the first draft, and allowance for the cost of acidizing, deepening, plugging back, etc. provided for in the third draft. More important still, it included allowance for release of Schmitz and the Foxes from obligation to bear any part of the cost of dry holes that might be drilled by Standard.

"This obligation represented a very real risk. As testified by

Schmitz, Gulf Oil Corporation has previously drilled a dry hole in the field. (Tr. Pp. 105–106) The Wagner lease on which the discovery well was drilled became Unit Tracts 475 and 476. (Ex. B of the Plan) As shown by the plat atttached to the Plan as Exhibit A most of the leases assigned to Standard were far removed from the discovery well, some being more than four miles distant. The extent of the producing formation was necessarily unknown when the agreement was negotiated, and therefore there was a definite possibility that as many as six dry holes might be drilled by Standard. In retrospect, three of the wells drilled by Standard actually were dry in the Hunton Lime formation, although two of these were completed for production from the Bartlesville formation. (Stip. Par. 27)

"Elimination of the obligation to contribute to the cost of dry holes could not have been anything but detrimental to Sohio, and therefore it may be assumed that the obligation was eliminated in the final agreement at the insistence of Schmitz and the Foxes. In that agreement they got what they wanted—an overriding royalty that was entirely free of risk and entirely free of expense of any kind. To obtain such an overriding royalty, they agreed to the monthly per well deduction of $200.00 or $250.00 in lieu of the deductions provided for in previous drafts."

Plaintiffs contend in support of their argument relating to original intention that plaintiffs relied on Standard's great experience and knowledge in arriving at the dollar amount of the per well deduction for the alleged operating expenses (plaintiffs' brief, page 15); that plaintiffs were new to the oil and gas business (plaintiffs' brief, page 3) that neither was represented by counsel at the negotiations (plaintiffs' brief, pp. 3, 4).

Defendants however maintain that Schmitz and Fox were in reality shrewd businessmen; that the Foxes were experienced as chief executives of Peter Fox Brewing Company; that Schmitz was experienced as a manufacturer engaged in fabrication of steel; that they engaged in negotiations for a period of two months before executing the final agreement; that after the agreement of August 23, 1943, they had an additional six months experience in the operation of Hunton Lime wells in the West Edmond Field before executing the second agreement; that Schmitz prior to August 20, 1943 had been in the oil business for one and a half years and had drilled ten wells in Illinois and Texas; that both Schmitz and Fox had four months of experience in the operation of the discovery well in the West Edmond Field before August 20, 1943.

I do not agree with defendants that by virtue of the agreement of October, 1947 (Stipulation, par. 7) plaintiffs have compromised and released this alleged cause of action. However, I am of the opinion that this agreement is pertinent to the issue of original intention as well as plaintiffs' standing in equity. Paragraph 7 of the Stipulation provides as follows:

"On or about October 1, 1947, W. J. Fox and Schmitz met with Earl D. Wallace, then Vice President of Sohio, at Sohio's office in the City of Cleveland, Ohio, to discuss demands theretofore made by them for a reduction in the monthly per well deductions provided for in the First Agreement and in the Second Agreement. In the course of this discussion said Wallace, on behalf of Sohio, offered to reduce to $200.00 per month the per well deduction applicable to wells producing water in excess of 10% of total fluids produced. This offer was accepted by Schmitz by letter dated October 7, 1947, and was accepted on behalf of Brewing Company by letter dated October 24, 1947, copies of said letters being hereto attached, marked Exhibits S–3 and S–4 respectively, and made part thereof. Accordingly, from and after October 1, 1947, the monthly

per well deduction was reduced to $200.00 regardless of the quantity of water, if any, produced during the month by the well."

Since eight of the twenty-three wells here involved were making more than 10% water on October 1, 1947 (stipulation, par. 6) and were therefore subject to the monthly deduction of $250 per well, the agreement of October, 1947 was of definite benefit to plaintiffs. It is difficult to determine from the record of what benefit this agreement was to defendants though there is a hint that Sohio was interested in having plaintiffs join the unitization of the field. However, at page 35 of the Transcript, upon redirect examination of Schmitz, the following colloquy takes place:

"Q. Now, at that time was there any discussion by you and by Mr. Fox with any representative of Sohio relative to the fact that unitization, if you joined this group, let me put it that way, there would be in the future some reduction of your interest charges?

"A. I can't say there were any remarks made along that line * * "

Upon all the evidence before me therefore, I cannot state with any degree of certainty why the agreement of October, 1947 was entered into between the parties though it does suspiciously coincide with the effective date of unitization thus lending credence to defendants' argument.

The fact that plaintiffs made no objections to the fixed per well deductions upon plugged wells for several years is also, in my opinion, pertinent to the issue of original intention as well as to the equitable position of plaintiffs.

Plaintiffs, in this regard, contend that Fox and Schmitz did not become aware of the discrepancies between operating expenses and the fixed monthly deductions until the 1950's (transcript p. 36).

Defendants' argument is as follows:

"As shown by the statements attached to the Stipulation as Exhibit S-6, it cost Sohio an average of $243.00 per well per month to operate the twenty-three wells here involved during the first nine months of 1947. Fox testified that between 1943 and 1946, the Foxes had drilled about twenty wells of their own in the West Edmond Field. (Tr. 114) and paid the cost of operating these wells. (Tr. 116) Schmitz (who claims to remember so clearly discussions that occurred in July and August of 1943) wasn't sure whether he had drilled six or eight or ten wells in the West Edmond Field, but admitted that he paid operating expenses on these wells. (Tr. 109) By October, 1947, therefore, both Schmitz and the Foxes had had ample opportunity to learn what it cost to operate a Hunton Lime well in the West Edmond field. Unless they were extravagant and inefficient operators, their operating costs could not have been substantially more than Sohio's.

"It follows that in October, 1947, Schmitz and the Foxes were quite aware that $200.00 represented far more than one-half of the monthly cost of operating a Hunton Lime well in the West Edmond Field. Moreover, they had had enough experience to realize that the average cost per well of operating nearly 750 wells under a single management, and with a single labor force, was bound to be less than the average per well cost incurred in operating twenty-three scattered wells. When they agreed to the settlement set forth in Paragraph 7 of the Stipulation, they had full knowledge of all relevant facts.

"In addition, the agreements themselves show that Schmitz and the Foxes, when the agreements were entered into, were aware of two critical factors: (1) that a time would come when one-half of the working interest production would be less than $200.00 per well per month, and (2) that production from the various wells would decline at vary-

ing rates. Bearing in mind that the overriding royalty reserved in each agreement was not to be computed separately for each well, but by combining the production from all of the wells, Schmitz and the Foxes (despite their claimed ignorance and inexperience) were astute enough to protect themselves against the likelihood that one-half of the working interest production from some wells would amount to less than $200.00 per well per month sooner than in the case of other wells. Hence, the following provision appears in the fourth paragraph of Section (4) of each agreement:

" 'If at any time hereafter one-half of the gross production * * * from any well shall not exceed the amount deductible under Paragraph 4-b (i. e. $200.00 or $250.00 per well per month) * * * and such condition continues for a period of ninety days or more, Fox may, at his option at any time thereafter tender to standard * * * an assignment of all of its right, title and interest in and to the overriding royalty reserved herein insofar as the same relates or pertains to production from such well, and thereafter all computations of overriding royalties hereunder shall be made without reference to all or any part of the production from such well.'

"This provision could not possibly be anything but detrimental to Sohio, and therefore was designed solely for the protection of the overriding royalty. Undoubtedly, therefore, the provision was included in the agreements at the instance of Schmitz and the Foxes to guard against the inevitable circumstance that production from some wells would decline more rapidly than that of other wells.

"It is significant that the one and only written complaint made either by the Foxes or by Schmitz before the filing of this suit related only to the continuance of the per well de-

duction after a well had been abandoned, that complaint being a letter dated April 14, 1951, from the Foxes to Sohio. (Defs.' Ex. 1) As shown by Paragraph 10 of the Stipulation, the earliest abandonment of a well on one of the twenty-three tracts occurred January 18, 1951. For the following month the per well deduction was made by Sohio for the first time on production allocated to a tract whose well had been abandoned. By the terms of the agreement of August 20, 1943, payment for that month became due by the end of March, 1951. Almost immediately thereafter the Foxes protested this deduction by the one and only written complaint made before this suit was filed.

"The amount involved in that complaint was only $200.00—a trivial sum in comparison with plaintiffs' present demand. The Foxes, however, were quick to make written objection. That they made no other written complaint in convincing evidence that they knew they had no basis for demanding a general reduction in the monthly per well deductions provided for in the agreements."

Plaintiffs argue in further support of their equitable position that defendants' imposition of fixed per well deductions after unitization has deprived plaintiffs of substantial royalties. I would summarize their argument as follows:

(a) Prior to unitization plaintiffs and defendant shared operating expenses in the proportions of approximately 60% and 40%, respectively (plaintiffs' exhibit 17);

(b) In the absence of unitization, the sharing of operating expenses would have continued substantially in the foregoing proportions throughout the productive life of the assigned properties (plaintiffs' exhibit 19);

(c) Since unitization plaintiffs' royalty has in fact been charged with 101.26% of allocated unit expense (plaintiffs' exhibit 18);

(d) Consequently, after unitization plaintiffs' share of the combined net revenues fell short of the intended 50% share by $329,156.

Defendants on the other hand argue:

(a) That unitization has been of great value to overriding royalty interests;

(b) That the total profit to overriding royalties has been $2,447,072 upon an investment of $24,000 while Sohio, upon an investment of nearly $1,700,000 has realized a profit of $1,509,254;

(c) That prior to unitization the net profit or to the overriding royalties was 1,400 times Sohio's net profit;

(d) That the decrease in overriding royalties has been nothing more than the inevitable result in the gradual decline in production and not any condition brought about by unitization.

Neither the arguments of plaintiffs or of defendants seem to me persuasive in this determination.

Based upon the evidence before me and the foregoing arguments, plaintiffs submit that the agreements must be reformed in accordance with (1) the requirements of the Act; (2) basic principles of equity.

Plaintiffs refer to Section 287.3 of the Act requiring that unitization be "fair, reasonable, equitable" and upon terms and conditions "necessary * * * to protect, safeguard, and adjust the respective rights and obligations of the several persons affected * * *"

I find this provision to be a mandate to the Commission. The order creating the unit carries out this mandate in paragraph 13 where it is expressly found that the Plan is "fair, reasonable and equitable and contains all the terms, provisions, conditions and requirements reasonably necessary and proper to protect, safeguard and adjust the respective rights and obligations of the several persons affected * * *" Since the Plan is not here under attack this provision however, becomes irrelevant.

Plaintiff also refers to the provisions of Section 287.9 of the Act which provides in part as follows:

"Property rights, leases, contracts, and all other rights and obligations shall be regarded as amended and modified to the extent necessary to conform to the provisions and requirements of this Act and to any valid and applicable plan of unitization or order of the Commission made and adopted pursuant hereto * * *

"The amount of the unit production allocated to each separately-owned tract within the unit * * * shall be distributed among or the proceeds thereof paid to the several persons entitled to share in the production from such separately-owned tract in the same manner, in the same proportions, and upon the same conditions that they would have participated and shared in the production or proceeds thereof from said separately-owned tract had not said unit been organized * * *"

Article VI of the Plan provides in part:

"* * * Property rights, leases, contracts and all other rights and obligations in respect of the Oil and Gas Rights in and to the several Separately-Owned Tracts within the Unit Area are hereby amended and modified to the extent necessary to make the same conform to the provisions and requirements of this Plan of Unitization, but otherwise to remain in full force and effect."

It is clear from the first paragraph, quoted above, from Section 287.9 and from Article VI of the Plan that the amendments and modifications referred to, are limited "to the extent necessary" to make the agreements conform to the requirements of the Plan which, I find, relates to changes necessary for unitization and not adjustment of personal disputes. It is further provided in the Plan that in all other respects contracts are "to remain in full force and effect."

. Article VII of the Plan, relied upon by defendants as prohibiting any change in proportionate shares, is based upon the second paragraph, quoted above, of Section 287.9 of the Act, which plaintiffs maintain entitles them to reformation upon the evidence. It seems fairly clear that these provisions are nothing more than a statement of existing law and, other than this, in no way affect this determination.

Plaintiffs refer to the following statutory provisions:

"A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful." 15 Okla.Stat. Section 152 (1951).

"A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable and capable of being carried into effect, if it can be done without violating the intention of the parties." 15 Okla.Stat., Section 159 (1951).

"A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." 15 Okla.Stat. Section 163 (1951).

Plaintiffs also refer to Harjo v. Harjo, 207 Okl. 73, 247 P.2d 522; Tyer v. Caldwell, 114 Okl. 13, 242 P. 760; Withington v. Gypsy Oil Co., 68 Okl. 138, 172 P. 634, and argue that the evidence before me, viewed in light of the above provisions and decisions, requires that the agreements be reformed so as to eliminate the fixed per well deduction as of October 1, 1947 and replace it with an obligation of plaintiffs to contribute one-half of the unit operating expenses allocated to the twenty-three tracts in controversy.

Defendants, on the other hand, quote from the Supreme Court of Oklahoma in Douglas v. Douglas, 176 Okl. 378, 56 P.2d 362, at page 369, where the Court stated:

" * * * However, reformation will not be decreed unless the proofs in favor thereof are clear, unequivocal, and decisive. In passing upon the proof requirements for the reformation of a written instrument this court, in the case of American Life Insurance Co. v. Rattcliff, et al., 168 Okl. 439, 33 P.(2d) 634, loc. cit. 635, had this to say: 'The rule stated by the authorities shows that in order to justify the reformation of a deed which fails to conform to the agreement of the parties because of mutual mistake, the proof should be clear, unequivocal and decisive. There must be more than a mere preponderance of the evidence, and the evidence must be sufficient to take the question out of the range of reasonable controversy.' "

It was not within the powers of the trial court to make a new and different contract for the parties.

Defendants also quote from Oklahoma Company v. O'Neil, 333 P.2d 534, at page 544 where the Supreme Court of Oklahoma stated:

"In the absence of fraud, all previous oral discussions are merged into and superseded by the terms of an executed written agreement and its terms cannot be varied by parol testimony."

Defendants also cite Harley v. Magnolia Petroleum Company, 378 Ill. 19, 37 N.E.2d 760, 137 A.L.R. 900 and Zimmerman v. Schuster, 14 Ill.App.2d 535, 145 N.E.2d 94, and argue, that based upon the evidence and the above cited Oklahoma and Illinois authorities, plaintiffs are not entitled to the relief they here seek.

I am in accord with defendants' statement of the law. Likewise, I am in accord with the statutory authorities cited by plaintiff though I find that these case authorities are not pertinent to the issues before me.

Accordingly, and for the reasons heretofore set forth, I find that none of the provisions of the Act or Plan referred to

**762**

by the parties directly relate themselves to the issues now before me.

 I find, though Schmitz and Fox testified that it was their intention to receive one-half of production and to bear one-half of operating expenses by virtue of the agreements here in question, that the evidence, judged in its entirety, does not entitle plaintiffs to the relief they here seek. This finding, as indicated heretofore herein, is primarily, though not solely, based upon the following considerations:

1. The complete picture, which, as trier of facts, I have formed from all of the evidence of plaintiffs and defendants as well as from their relationship before and after unitization;

2. The agreements themselves which contemplate "shut in" wells and yet, make no provision in this event, as to paragraph 4(b);

3. A comparison of the several drafts preceding the first of the two agreements in the light of the arguments advanced by the parties;

4. The obvious experience of Fox and Schmitz in general business as well as the oil business before the agreements were executed;

5. The agreement of October, 1947, approximately the same time unitization became effective, by which Sohio gave up the right to a deduction of $50 per month in respect of each of the eight wells that were producing more than 10% water;

6. The fact that Fox and Schmitz did not pursue this action until many years after unitization, though it is clear that on other occasions they were quick to make objections. It is difficult to believe in light of their experience that they were not aware of the "vast discrepancies between unit operating expenses and the fixed monthly deduction until sometime in the early 1950's."

Accordingly, it is hereby Ordered Adjudged and Decreed that the complaint, as amended, be and the same is hereby dismissed at plaintiffs' costs. Let judgment accordingly enter for defendants.

The foregoing shall, in accordance with the provisions of Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C., stand as the Court's findings of fact and conclusions of law herein.